# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | |
|---|---|
| BASF CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    2:07 CV 222 PPS |
| | ) |
| ARISTO, INC. and VICTOR ROSYNSKY, | ) |
| | ) |
| Defendants. | ) |

## OPINION and ORDER

Before the Court is Plaintiff BASF Corporation's Motion to Strike Defendants' Untimely Supplemental Expert Reports of J. Sawyer and J. Snell. [DE 239.] The two supplemental expert reports at issue were submitted by Defendant Aristo, Inc.'s technical expert and damages expert. BASF believes that these reports were untimely produced and thus must be stricken; Aristo argues to the contrary. For the reasons explained below, BASF's motion will be denied, but it will be given leave to depose both experts prior to trial and file rebuttal expert reports.

## Procedural Standard

Expert reports are governed by Federal Rule of Civil Procedure 26, which requires that a party disclose the identity of any expert witness it intends to use at trial and to submit a written report prepared and signed by that expert. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). This disclosure must be made at the time the court orders or as stipulated to by the parties. Fed. R. Civ. P. 26(a)(2)(D). The written expert report must contain, in relevant part: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the data or other information considered by the witness in forming them; [and] (iii) any

-1-

exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B)(i-iii). A party who has disclosed such an expert report "must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). "The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their case adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1093-94 (N.D. Ill. 2001) (citing *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000)).

In order to enforce these expert discovery rules, Rule 37 provides that parties which fail to provide information as required by Rule 26 are not allowed to use that information at trial, "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The determination of whether the failure to disclose new expert opinions is "harmless or justified is left to the broad discretion of the district court." *Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir. 2005). While the Court need not make explicit findings when determining if the failure was substantially justified or harmless, the Court is guided by four factors: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Tribble v. Evangelides*, 670 F.3d 753, 670 (7th Cir. 2012).

## Analysis

Readers hoping for an extensive discussion of the factual backdrop of this case are directed to my September 7, 2011 claims construction (*Markman*) opinion [DE 161] and my

May 29, 2012 summary judgment opinion [DE 252].   In summary, BASF claims that Aristo

infringed its "'210 patent," which teaches a method of coating ceramic substrates that form the

core component of catalytic converters.  The efficiency in coating these substrates is important

because the coating material is made from precious metals and is very expensive, so every drop

counts.  BASF believes that the substrates Aristo manufactures on its "MISO Coater" machine

infringe its patent and that it is entitled to damages for, among other things, all the infringing

units Aristo has manufactured on the MISO Coater to the present day.

Both sides have engaged in extensive discovery over the past five years.  In the fall of

2009, the parties submitted various expert reports, rebuttal reports, and supplemental reports

from both technical experts and damages experts.  In August of 2010, the parties discussed the

fact that prior to trial the reports of their damages experts would need to be supplemented in

order to ensure that the damages estimate included the units Aristo had manufactured during the

years between the original expert reports (2009) and the actual date of trial (2012).  As trial

approached, the parties raised this issue again, and BASF's counsel proposed the following

deadlines in an email to Aristo's counsel:

- Friday March 30, 2012:  Updated damages-related production from Aristo concerning number of substrates coated on MISO Coater.

- Tuesday April 17, 2012:  Plaintiff's Expert provides updated damages calculation based upon March 30 production (no methodology change from prior reports).

- Friday April 27, 2012:  Response by Defendants' Expert to April 17 updated damages calculation (no methodology change from prior reports).

[DE 240-9.]  Aristo's attorneys never really fully acceded to this schedule in writing – at least

there is no evidence of that before me now – but they did respond they would "review" it and the

parties then all proceeded to actually meet those deadlines, indicating that they at least had a tacit

agreement about this proposed schedule.

At issue in BASF's Motion are the two reports Aristo submitted in April. BASF's central gripe is that these reports flaunt the parties ostensible agreement that there would be "no methodology change from prior reports." BASF's supplemental expert report did nothing but take the methodology for calculating damages from its original report and update it with the new manufacturing numbers. BASF argues that this is exactly what Aristo's damages expert should have done as well, but that instead Aristo 1) filed not just one but *two* reports (one from its technical expert and one from its damages expert) and 2) that these reports together presented an entirely new way of thinking about damages in the case. Aristo responds that this is not really a new methodology, but is simply an update of its damages calculation in light of the claims construction opinion, which required an analysis from both its technical expert and its damages expert.

To untangle these arguments, we have to start with some basic principles of patent damages. The fundamental question in determining damages in a patent case is: "had the Infringer not infringed, what would the Patent Holder-Licensee have made?" *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) (plurality opinion). The two basic ways of calculating what a patent holder would have made are its lost profits or a hypothetical reasonable royalty. *See* Mark A. Lemley, "Distinguishing Lost Profits From Reasonable Royalties," 51 Wm. & Mary L. Rev. 655 (2009). The expert reports at issue here are focused on the latter method – the calculation of a reasonable royalty that Aristo would have paid BASF to use its '210 patent. This metaphysical analysis requires a sort of hypothetical "reconstruction" of the market as it would have developed but for the infringement, which generally depends on

figuring out what the infringer would have paid the inventor in royalties for use of the invention.

But what if, instead of licensing the product, the infringer could spend some money to change its manufacturing process such that its product would be basically identical but would no longer be infringing?  If that money spent changing the manufacturing process cost less than licensing it would cost, then it would make rational economic sense for the infringer to spend the money to change its manufacturing instead of spending more money on licensing.  And if the infringer did have that option, then it would also make sense for the calculation of damages in an infringement case to be the cost of changing the process rather than the cost of licensing.

All of that analysis basically summarizes the logical conclusion that the Federal Circuit arrived at in *Grain Processing Corp. v. American Maize-Products Co.,* 185 F.3d 1341 (Fed. Cir. 1999):

> [A] fair and accurate reconstruction of the "but for" market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.  Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether.  The competitor in the "but for" marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner.  Moreover, only by comparing the patented invention to its next-best available alternative(s) - regardless of whether the alternative(s) were actually produced and sold during the infringement - can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right.  Thus, an accurate reconstruction of the hypothetical "but for" market takes into account any alternatives available to the infringer.

*Grain Processing*, 185 F.3d at 1350-51 (internal citations omitted).

It's worth noting at this point that this analysis only demands that the alternatives be taken "into account" in reconstructing the market – it doesn't mean that royalty damages are

capped at the amount it would have cost to produce the alternative.  Indeed, the Federal Circuit recently made this point quite explicitly:

> [E]ven if [defendant] had shown that it had an acceptable noninfringing alternative at the time of the hypothetical negotiation, [it] is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. . . . To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement.

*Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir 2008). Thus, while not dispositive of the damages calculation, noninfringing alternatives can be considered, and Aristo's supplemental expert reports argue that it has an available "alternative" that should be considered here.

To understand this alternative, we need a quick refresher on the process at issue in BASF's '210 patent.  In broad brush strokes, BASF's patent teaches a process whereby a ceramic substrate is dipped in a slurry bath, a vacuum sucks up the slurry through the substrate so that it covers half of it, the substrate is flipped over, put back into the bath, the vacuum is applied again, and the other half of the substrate is covered.  The key advantage of this process is that the entire substrate is covered but that there is very little overlap of slurry – almost no part of the substrate gets coated twice – a vitally important point because, as mentioned above, the precious metals in the slurry are so expensive.  This lack of overlap is what the '210 patent calls the "uniform coating profile," a term which I construed to mean, "The substrate is coated by the slurry to approximately the same length across the channels so that the profile deviates only slightly, if at all, across the width of the substrate."  [DE 161.]   And this is different than previous methods that BASF had employed to coat substrates prior to the '210 patent.  Indeed,

this is the whole reason BASF was able to convince the patent office that the '210 patent should be issued in the first place. In the previous methods, slurry would be applied in a manner that would create a curved line, rather than a straight line, meaning that when the substrate was flipped and the slurry was applied again, a football-shaped portion of the substrate would end up double-coated, thus wasting precious metals.

Now, back to *Grain Processing* and Aristo's argument that it has an available "noninfringing alternative" that needs to be taken into account when calculating damages. Aristo argues that all it needs to do to create a noninfringing alternative to the '210 patent is tweak the settings on the MISO Coater in order to produce a substrate that would not have a uniform coating profile (*i.e.*, it would have a curved line rather than a straight line). This analysis, Aristo argues, is the reason it needed to submit a supplemental report from its technical expert Dr. Sawyer. His report explains that making only minor adjustments to the MISO Coater, like changing the vacuum intensity or duration, would create a coating profile that would fall outside a "uniform coating profile" and would instead look more like the curvilinear techniques that the prior art taught.

With this analysis in hand, Aristo could then produce its second supplemental report, this time from its damages expert Jeffrey Snell. That report built on the next step in the *Grain Processing* analysis: What would the noninfringing alternative identified by Dr. Sawyer – i.e., tweaking the settings on the MISO Coater to make a less-than-uniform coating profile – have cost compared to licensing the '210 patent from BASF? Snell's report concluded that tweaking the MISO Coater would have cost significantly less than licensing the '210 patent, and thus Aristo would not have agreed to a royalty amount any greater than what it would have cost to

modify the MISO Coater.

BASF has a number of objections about this analysis, which I'll get to, but I find it hard to quibble with the basic substance of these reports. It makes sense that in evaluating damages and "reconstructing" the market at issue here – which is "by definition a hypothetical enterprise," in the words of *Grain Processing* – that we should take into account the possibility that Aristo could cheaply make a noninfringing alternative. It also makes sense that a substrate with a curvilinear profile would be noninfringing, since the ultimately winning argument BASF used throughout the prosecution history of its '210 patent was to distinguish the uniform coating profile it created from the curvilinear profile of its prior patents. [*See* DE 161 at 4-5.]

So while I can generally countenance the substance of Aristo's supplemental reports, their procedure is harder to stomach: Why did Aristo wait until late-April of this year to submit these reports? Aristo's fairly lame response is that it could not conduct this analysis until the Court issued its claims construction opinion: "Until the Courts' *Markman* Order, it was not possible to know where the contours were of the uniform coating profile so as to determine the cost savings of the true next best alternative (i.e. Aristo's MISO machine with operating process parameters set to avoid the infringing uniform coating profile)." [DE 256 at 4.] Fair enough. But the *Markman* opinion was issued on September 7, 2011 – and Aristo then waited nearly a full eight months before submitting these updated reports, a delay that is left completely unexplained.

But even as frustrating as this is, in the absence of other arguments I am hesitant to strike the reports on this delay alone. BASF raises a number of other arguments in favor of doing so, but none of them are sufficiently persuasive. First, BASF argues that Aristo breached their

agreement that supplemental reports would not contain any new methodologies and would only update damage estimates based on the new manufacturing numbers. But it's not particularly clear that Aristo ever actually did make that agreement. And even if they did, Aristo argues that "no 'new methodologies' are presented in Mr. Snell's calculation of cost savings. Mr. Snell merely updates the rebuttal portion of his previous report to calculate cost savings based on the latest relevant information (including the Court's *Markman* Order)." [DE 256 at 5.] While BASF is beside itself over this argument, I think it is true at a certain level of generality: the basic "methodology" employed by the damages experts is to establish principles that would reconstruct the market and establish hypothetical royalties, and these supplemental reports are consistent with that methodology.

BASF also argues it will be severely prejudiced by these reports: "Any attempts to cure the harm caused by Aristo's late reports will only cause added expense and further delay. If the new expert opinions are not precluded, then BASF will require an opportunity to investigate, to potentially prepare its own expert reports responding to Aristo's, and both sides may need to depose the experts anew." [DE 240 at 11.] These reports will, to be sure, require more work of the parties in what is already a busy five weeks before trial. But it is not *unduly* complicated or prejudicial: BASF can depose experts Snell and Sawyer on what are the fairly narrow topics in their relatively short reports, and if BASF believes short rebuttal reports are also necessary from its experts it can produce those as well.

Finally, BASF argues that the entire *Grain Processing* analysis is flawed from the start because it only applies when there is "***an acceptable*** noninfringing alternative" – "acceptable" meaning viewed as equivalent by buyers in the reconstructed market – and that the noninfringing

alternatives proposed by Aristo are not "acceptable." This argument goes to the root of one of the disputes between the parties – namely, the markets where the parties sold their catalytic converters. BASF designs and manufactures catalytic converters for automobiles in the Original Equipment Manufacturer ("OEM") market, meaning that BASF's main customers are the major automobile manufacturers. Aristo manufactures and sells catalytic converter substrates for use in the catalytic converter aftermarket, meaning its customers have traditionally been automotive repair and replacement companies. It is undisputed that Aristo built the MISO Coater with plans of entering the OEM market, but thus far all of the units produced on the MISO Coater have only been sold in the aftermarket. BASF argues that Aristo's proposed noninfringing alternative would be unacceptable in the OEM market and that therefore the "purported alternative is no alternative at all – to go with a substantially inferior product, Aristo would have to reject selling into the OEM market and it is undisputed that Aristo wanted the MISO Coater specifically to enter the OEM market. Accordingly, such an inferior product would never have been acceptable to Aristo because OEM entry was paramount to the investment." [DE 270 at 5.]

This may very well be a winning argument for BASF: the *Grain Processing* analysis is not applicable to this case because the noninfringing alternative proposed by Aristo is not actually a legitimate alternative. But that's a substantive critique of the analysis that's ripe for cross-examination of Aristo's experts and rebuttal testimony of BASF's experts in order to prove that it is not the way damages should be calculated in this case. It's not a reason to strike the reports from the outset.

Given all this analysis and the broad discretion afforded me under these circumstances, I find that any potential harm of these supplemental reports is outweighed by the ability to cure it

through additional, limited depositions and rebuttal reports.  *See Braun Corp. v. Vantage Mobility Intern., LLC*, 2010 WL 2039596, at *5 (N.D. Ind. 2010) (any prejudice resulting from an untimely expert report could be cured by permitting defendant to depose the expert on the matters raised in the report); *McCloud ex rel. Hall v. Goodyear Dunlop Tires North America, Ltd.*, 2006 WL 5230020, at *2 (C.D .Ill. 2006) (finding that where defendants were prejudiced by plaintiff's untimely disclosure of a second expert report, any prejudice that defendants may suffer from the report's untimeliness could be remedied by allowing them another opportunity to depose the expert).

I therefore conclude that, even assuming Aristo's supplemental reports were in violation of Rule 26, that violation was harmless under Rule 37 because the totality of the elements of harm – (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date – favors Aristo, for all the reasons discussed above.

## CONCLUSION

BASF Corporation's Motion to Strike Defendants' Untimely Supplemental Expert Reports of J. Sawyer and J. Snell [DE 239] is **DENIED**.  It is **ORDERED** that Aristo shall make available, at BASF's convenience, both expert Sawyer and expert Snell for a deposition within 21 days of this Order.  It is further **ORDERED** that BASF may also, within 21 days of this Order, submit rebuttal expert reports to the supplemental reports of Sawyer and Snell.  If BASF does submit rebuttal expert reports, it is **ORDERED** that Aristo shall have seven days after being served with the reports to depose those experts on the limited topics contained within those

reports.

**SO ORDERED**.

ENTERED: June 12, 2012

<u>s/ Philip P. Simon</u>
PHILIP P. SIMON, CHIEF JUDGE
UNITED STATES DISTRICT COURT