UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BASF CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 2:07 CV 222  PPS |
| ) | |
| ARISTO, INC. and VICTOR ROSYNSKY, ) | |
| ) | |
| Defendants. ) | |

## OPINION and ORDER

Presently before the Court in this patent infringement case are cross-*Daubert* motions in which each side argues for the exclusion of testimony from the other side's expert on damages. [DE 241 and 246.]  For the reasons explained below, both of these motions will be denied.

**Procedural Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 (1993).[1]  *See Lewis v. Citgo Petroleum Corp*., 561 F.3d 698, 705 (7th Cir. 2009).  Rule 702 provides, in relevant part, that if "scientific, technical or other specialized knowledge will help the trier of fact[,] . . . a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion . . . ."  Fed. R. Evid. 702.  The Rule "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must

---

[1] Although any appeal in this case would be taken in the Court of Appeals for the Federal Circuit, the law of the Seventh Circuit controls in regard to the Court's evidentiary rulings. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) ("Because these evidentiary rulings raise procedural issues not unique to patent law, this court applies the law of the regional circuit where appeals from the district court would normally lie.").

be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010).

Under this framework, this Court must act as a gatekeeper for expert testimony, determining prior to admission whether the testimony is both relevant and reliable. *U.S. v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). In conducting this inquiry, the Court is to focus solely on principles and methodology, not on the conclusions they generate. *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

In this case, the parties do not challenge the qualifications or methodologies of the experts. Rather, the challenge to both of the experts relates to whether the methods used by the expert were properly applied to the facts of the case. It "is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Where that link is missing, a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## Background on Patent Damages

The fundamental question in determining damages in a patent case is: "had the Infringer not infringed, what would the Patent Holder-Licensee have made?" *Aro Mfg. Co. v. Convertible*

*Top Replacement Co.*, 377 U.S. 476, 507 (1964) (plurality opinion). The two basic ways of calculating what a patent holder would have made are 1) lost profits or 2) a hypothetical reasonable royalty. John Skenyon et al., *Patent Damages Law & Practice* § 1:3 (2011).

In this case, each side's damages expert has focused on the calculation of a reasonable royalty. To calculate this royalty, experts engage in a metaphysical process of imagining a hypothetical negotiation, in which the asserted patent claims are assumed valid, enforceable, and infringed, and then attempt "to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). This hypothetical negotiation "necessarily involves an element of approximation and uncertainty." *Id.* at 1325. The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement. *Id.* In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme. *Id.* In going through this process, experts utilize the fifteen factors enunciated in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). The Federal Circuit has expressly "sanctioned the use of the *Georgia–Pacific* factors to frame the reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

Applying the *Georgia–Pacific* factors is an exercise in imagination, and various tensions have arisen over how to properly write this fiction. One central dispute concerns the amount of information the parties should be imagined to have had at the point the hypothetical royalty negotiation is imagined to have taken place. It is clear that experts are supposed to imagine the

reasonable royalty negotiation taking place on the date infringement began, which means that the parties would have no knowledge of events after the date of infringement that might impact the hypothetical negotiation – a sort of blank slate approach. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (6th Cir. 1978). But there is also caselaw that cuts in the other direction that allows experts to consider events after the date infringement began. This rule has the corny moniker of the "Book of Wisdom," which the Federal Circuit recently explained in detail:

> In *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698(1933), the Supreme Court recognized that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation: "[A] different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within." Similarly, our case law affirms the availability of post-infringement evidence as probative in certain circumstances. In *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), we observed that the hypothetical negotiation analysis "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable.

*Lucent*, 580 F.3d at 1333-34.

Thus, the amount of information that the parties are imagined to have at the hypothetical royalty negotiation exists on a spectrum. On one end the infringing party is treated as a blank slate; on the other end it is treated as having perfect hindsight. Where any given case should properly fall on this spectrum is "determined by the circumstances of each case." *Id.* at 1334. BASF states this point well in its briefing on these motions: "there is no bright-line test for whether an expert's reliance on post-negotiation facts is appropriate or not, [and] the Federal

Circuit has endorsed a case-by-case, fact-driven analysis to make that determination." [DE 267 at 5.]

## Analysis

For a more extensive discussion of this case I refer readers to my September 7, 2011 claims construction opinion [DE 161] and my May 29, 2012 summary judgment opinion [DE 252]. For present purposes it is enough to say that BASF claims that Aristo infringed its "'210 patent," which teaches a method of coating ceramic substrates that become the core component of catalytic converters. BASF believes that the substrates Aristo manufactures on its "MISO Coater" machine infringe its patent and that it is entitled to damages for, among other things, all the infringing units Aristo has manufactured on the MISO Coater to the present day.

As noted, the present dispute concerns the admissibility of testimony from each side's damages expert as to how the hypothetical royalty rate should be calculated. As I see things, this dispute teeters on two fundamental tensions at this case's core. First is the aforementioned methodological tension in the law of patent damages as to the amount of information the parties would have at the imagined royalty negotiation – *i.e.*, the blank slate approach versus the "Book of Wisdom" approach. The second tension is specific to the facts of this case: there are two different markets for catalytic converters. BASF designs and manufactures catalytic converters for automobiles in the Original Equipment Manufacturer ("OEM") market, meaning that BASF's main customers are the major automobile manufacturers. Aristo manufactures and sells catalytic converter substrates for use in the catalytic converter aftermarket, meaning its customers have traditionally been automotive repair and replacement companies. It is undisputed that Aristo built its MISO Coater with hopes of entering the OEM market, but it is also undisputed that so

far all of the units produced on the MISO Coater have only been sold in the aftermarket. In other words, Aristo has been altogether unsuccessful in their efforts to crack the OEM market.

Imagining a hypothetical royalty negotiation in this case thus depends in large part on how an expert chooses to resolve these tensions. An expert has to engage in the task of deciding what the parties would have been thinking at the negotiation about the market the substrates would be sold in (the OEM market, the aftermarket, or both) and the amount of post-infringement knowledge the parties should be able to use.

BASF's expert argues that the focus should be on the OEM market because Aristo intended to use the MISO Coater to produce substrates that would be adequate to enter the OEM market. Therefore, any hypothetical royalty needs to take into account that market. In this imagining of the negotiation, Aristo's mind was a blank slate, unaware of the fact that it would end up never actually entering the OEM market. As BASF puts it, "[T]he *Georgia-Pacific* hypothetical royalty negotiation would be framed by the parallel questions 'What would Aristo pay to enter the OEM market?' and 'What would BASF need to allow competition in the OEM market product niche?'" [DE 267 at 4.] But under the circumstances of this case, it may not be correct for the royalty calculation to focus exclusively on the OEM. It is possible Aristo would have been able to negotiate a lower royalty rate to account for the risk that it wouldn't be successful in its effort to enter the OEM (for any number of reasons) and would instead be relegated to the aftermarket – which, it turns out, is exactly what has happened. A jury could very well find that BASF's royalty calculation is excessive in its emphasis on the OEM.

Aristo's expert uses the opposite approach; he views the issue from the benefit of hindsight and makes note of the practical reality that Aristo only sold substrates in the

aftermarket and never entered the OEM market. Using the Book of Wisdom rule, Aristo argues that this hypothetical royalty needs to take that reality into account. As Aristo puts it, its expert "properly applied the *Georgia-Pacific* factors and the 'Book of Wisdom' rule in assessing the alleged a [*sic*] reasonable royalty for the infringement, all of which occurred in the aftermarket." [DE 258 at 4.] But, just as a jury might not be persuaded by BASF's expert, a jury could very well find that Aristo's royalty calculation is unreasonable in its emphasis on the aftermarket and its minimization of the OEM.

As should be clear, one of the foundational questions that the jury will have to grapple with relating to damages is how likely it was that Aristo would be successful in breaking into the OEM market with the MISO Coater. BASF's expert says it was very likely that Aristo would break into the OEM and his damages numbers therefore reflect that fact; Aristo's expert, on the other hand, says it wasn't likely at all (since it didn't actually happen). At bottom, the likelihood of Aristo's success is a question of fact for a jury to decide. Deciding which expert's opinion is more plausible will depend on whose interpretation more persuasively resolves this central tension. BASF's own briefing describes things perfectly: "[T]he tension between when the hypothetical negotiation *includes* or *excludes* after-occurring knowledge (such as whether or not Aristo achieved OEM market penetration) is an issue for evaluating the competing experts." [DE 267 at 5.]

In sum, both *Daubert* motions will be denied. It is for the jury to decide the correctness of the facts that underlie each of these experts' opinions. *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). These experts are ready to be examined and cross-examined in front of a jury, which will determine who provides the more credible way of accounting for

damages in this case. The law of both the Seventh Circuit and the Federal Circuit supports this conclusion. As the Seventh Circuit has stated: "The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). The Federal Circuit recently expressed the same sentiment:

> While the data were certainly imperfect, and more (or different) data might have resulted in a "better" or more "accurate" estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony. Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to hear the expert testimony and decide for itself what to accept or reject. As the Supreme Court explained in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

*i4i Ltd.*, 598 F.3d at 856. The point was underscored again last year: "It is decidedly the jury's role to evaluate the weight to be given to the testimony of dueling qualified experts." *Uniloc*, 632 F.3d at 1306 (reversing district court's exclusion of expert testimony).

All of the preceding analysis addresses the main dispute at issue in the cross-*Daubert* motions, but there are a few other ancillary arguments in each motion that need to be briefly mentioned. BASF argues that Aristo's expert must be excluded because his analysis 1) relies on a faulty document purported to show BASF's cost savings from using the '210 patent, 2) misinterprets BASF internal reports on profitability, and 3) fails to properly account for contribution margins in his calculations of profitability. BASF also argues that Aristo's expert analysis missteps in the way it incorporates the fluctuating price of palladium over the past five

years – an important point in calculating the royalty rate, since the whole advantage of the '210 patent is that it minimizes the amount of precious metals (like palladium) used in coating substrates. For its part, Aristo argues that BASF's expert's royalty figure is unfounded and that his analysis fails to account for potential non-infringing alternatives.[2] It is also argues that in calculating the royalty rate BASF's expert improperly focused on the worldwide market rather than just the U.S. market. Having reviewed all of the counterarguments raised throughout the briefing on these issue, I have concluded that all of these arguments are perfectly fine ways for one side to impugn the other's expert on cross-examination but that none of them reveal so "great an analytical gap between the data and the opinion proffered" that they must be excluded before trial. *General Electric*, 522 U.S. at 146.

## CONCLUSION

For the reasons explained above, BASF's Motion Pursuant to F.R.E. 702 to Exclude the Testimony of Defendant's Expert Jeffrey G. Snell [DE 241] and Aristo's Motion to Exclude the Testimony at Trial of BASF's Damages Expert Creighton G. Hoffman [DE 246] are both **DENIED**.

**SO ORDERED**.

ENTERED: June 29, 2012

                                         s/ Philip P. Simon
                                         PHILIP P. SIMON, CHIEF JUDGE
                                         UNITED STATES DISTRICT COURT

---

[2]For more on the issue of non-infringing alternatives in this case, see my June 12, 2012 Opinion denying BASF's Motion to Strike [DE 286].